IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES BECKER and SASANNA
BECKER, on Behalf of Themselves
and All Others Similarly
Situated,

                Plaintiffs,

      v.

INLAND AMERICAN REAL ESTATE
TRUST, INC., J. MICHAEL BORDEN,
THOMAS F. GLAVIN, BRENDA G.
GUJRAL, DAVID MAHON, THOMAS F.
MEAGHER, ROBERT D. PARKS, PAULA
SABAN and WILLIAM J.
WIERZBICKI,

                Defendants.

Case No. 13 C 3128

Hon. Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

I.  BACKGROUND

This case involves real estate investment trusts ("REITs"). A REIT is an entity that combines the capital of many investors to acquire or invest in commercial real estate; that allows investors to invest in a real estate portfolio under professional management through the purchase of shares; that must pay distributions to its stockholders equal to at least 90% of its income; and is not typically subject to federal income taxes.  There are essentially two types of REITs:  those that are traded on an open exchange and those that are not.  Those that are traded on open exchanges are liquid similar to equity stocks.  Those that are not traded on

exchanges ("Non-Traded REITs") are considered generally illiquid, because sales, other than redemptions, are dependent on a limited secondary market.

Defendant, Inland American Real Estate Trust, Inc. ("Inland"), is a Non-Traded REIT, and is organized as a corporation under the laws of Maryland. It commenced business on August 1, 2005, with an initial public offering pursuant to a Prospectus registered with the Securities and Exchange Commission (the "SEC"). On January 7, 2009, Inland announced an additional public offering of its shares pursuant to a Prospectus that was also registered with the SEC. The 2009 public offering consisted of 5,000,000,000 primary shares priced at $10.00 per share and a public offering of 380,000,000 shares to be sold through the Inlands's Distribution Reinvestment Plan (the "DRP") priced at $9.50 per share. Inland's shareholders generally have an option, subject to limitations, to receive their distributions through share purchases under the DRP or in cash. Under the DRP, shareholders also have the opportunity to purchase additional shares at a price slightly below the current offering price to the general public. For example, this offering was priced at $9.50 per share under the DRP while the price to the general public was $10.00 per share.

Inland also maintains a Share Repurchase Program (the "SRP"). This program is designed to provide a limited measure of liquidity by allowing shareholders, subject to some restrictions, to sell

shares to Inland at a price either slightly below or equal to their current offering price to the general public, depending on how long the shareholder has owned the shares. Under the SRP, Inland's obligation to repurchase shares was dependant on it having sufficient funds. The amount of money available to fund the SRP was left to the sole discretion of the Board of Directors. In addition, the SRP was subject to suspension or termination if the Board determined such suspension of termination to be in the company's best interests.

The Prospectus cautioned prospective investors, including shareholders considering investing pursuant to the DRP, that the stock offering prices were "arbitrarily determined by [the] board of directors . . . in its sole discretion" based on three factors: the offering price of other REITS organized by Inland, the range of offering prices of other REITs that are not publicly traded, and the recommendation of its dealer manager, Inland Securities Corporation. The Prospectus further warned investors that:

- You should purchase our common stock only if you can afford a complete loss of your investment.

- You will not have an opportunity to evaluate our investments before we make them because we have not identified all of the specific assets that we will acquire in the future.

- There is no public market for our shares, the offering price was arbitrarily established and you may not be able to sell your shares at a price that equals or exceeds the [$9.50] offering price.

- 3 -

- There is no market for our shares and no assurance that one will develop. We do not expect that our shares will be listed for trading on a national securities exchange in the near future. You will not, therefore, be able to easily resell any shares that you may purchase in this offering. Any shares that you are able to resell may be sold at prices less than the amount you paid for them.

- The offering price of our shares may be higher or lower than the price at which the shares would trade if they were listed on a national securities exchange or actively traded by dealers or marketmakers. Further, there is no assurance that you will be able to sell any shares that you purchase in the offering at prices that equal or exceed the offering price, if at all. You may lose money on any sale.

At all relevant times, Inland's Board of Directors consisted of nine (9) Directors, Michael Borden, Thomas Glavin, David Mahon, Thomas Meagher, Paula Saban, William Wierzbicki, Brenda Gujral and Robert Parks. A majority of the Board, *i.e.,* Messrs. Borden, Glavin, Mahon, Meagher, Wierzbicki and Ms. Saban were independent directors (the "Independent Directors") with no employment or other material relationship with Inland or any organization affiliated with Inland. In addition to Inland, these nine directors are Defendants.

In February 2009, the Board announced that it intended to suspend the SRP until further notice, effective March 30, 2009. The expressed purpose of the suspension was that it was necessary for Inland to maintain a healthy cash position for purposes of maintaining its investment strategy at that particular time. In

2010, several third parties made "mini-tender" offers, *i.e.,* offers for fewer than 5% of the outstanding shares, to acquire a small percentage of Inland's outstanding shares at values far below Inland's estimate value of the share price. In response to these offers, the Board stated its belief that the prices being offered were less than the potential value of Inland's shares, although the Board stated that it did not intend to publish a new estimated share value until October of that year. On September 21, 2010, the Board published the estimated per-share value of shares at $8.03.

On March 11, 2011, Inland announced an "Amended and Restated" SRP that would allow a shareholder to request repurchase shares in the event of the death of a beneficial owner. Inland established the repurchase price at that time to be $7.23 a share, which was 90% of the most recent estimated per share value of $8.03. Finally, on December 12, 2012, the Board estimated its new estimated share price of $6.93. In each of the announcements of share value, the Board advised investors that the estimated value represented neither fair value according to U.S. Generally Accepted Accounting Principles nor the amount the shares might be expected to trade on a national securities exchange. Further, the Board emphasized that there were no assurances that a shareholder would be able to sell his shares at the estimated value. In addition, the Board in its December 12, 2012, announcement stated that it was

adjusting its valuation methodology to what was "currently the most commonly used valuation method by non-listed REITs."

On May 7, 2012, Inland announced that it had learned that the SEC was conducting a non-public, formal, fact-finding investigation to determine whether there had been violations of certain provisions of federal securities laws regarding business management fees, property management fees, transactions with affiliates, timing and amount of distributions paid to investors, determination of property impairments and any decision regarding whether the company might become a self-administered REIT. Inland relayed this information via its Form 10Q filed with the SEC on May 7, 2012. It stated in this filing that the company has been cooperating with the SEC and no conclusions had been reached. On November 9, 2012, Inland announced that in response to a demand by three shareholders for an investigation into certain claims for breach of fiduciary duty directed at the Board, the Business Manager and certain Business Manager Affiliates, the Board authorised the Independent Directors to investigate the claims. Pursuant to this authorization, the Independent Directors formed a Special Litigation Committee to investigate with assistance of independent legal counsel, and to make recommendations to the Board after completion of the investigation. The Special Committee investigation is ongoing.

The Plaintiffs allege that they, as existing shareholders of Inland, purchased additional shares of Inland on or after March 30, 2009 through Inland's DRP. Prior to acquiring their initial shares of Inland and prior to purchasing additional shares through the DRP, each Plaintiff executed a Subscription Agreement in which it was represented that the shareholder had received the relevant Prospectus which contained information as to the terms and conditions of the offerings, and restrictions on ownership and transfer of shares, including the warning information set forth above. Nevertheless, Plaintiffs allege in their Complaint that they purchased these additional shares "at inflated prices that did not reflect the true value of Inland American." They further allege that the prices charged under the DRP which ranged from $9.50 down to $6.93 a share, from March 30, 2009 through December 19, 2012, "were inflated and did not reflect the true value of Inland American shares." They further allege that the shares recently "are believed to have been traded on the secondary market at approximately $5.65-$6.00 a share." They further allege "Defendants repeatedly advised Inland American shareholders to reject tender offers by third parties offering to purchase Inland American shares at prices as low as $4.00 a share and reiterated Defendants' claim that the Company's shares were worth much more." They contend that no changes in market fundamentals or Inland's business and prospects over time explain this vast divergence

between Defendants' purported valuation of Inland American shares and the price at which the market valued Inland American shares. Then, incongruously, they allege that "Defendants knew that values of commercial and residential real estate such as that held by Inland American's portfolio had begun to significantly deteriorate long before Defendants began to lower the price for sales under the DRP in September 2010." Plaintiffs blame this alleged discrepancy on the Board, charging it with "refusing to inform themselves of the value of the Company, acting in bad faith and in breach of the fiduciary duty of loyalty in pricing the Company's stock for purposes of DRP sales." They lastly claim that they were damaged by paying inflated prices for Inland's shares pursuant to the DRP. They allege that they represent a class of purchasers of Inland stock pursuant to the DRP from March 30, 2009 to the present. They allege that under the DRP Inland sold 24,347,096, 22,787,584, 24,855,275, and 26,571,399 shares in 2009, 2010, 2011, and 2012 respectively.

## II.  DISCUSSION

The Plaintiffs bring three counts in this class action proceeding:  Count I for breach of fiduciary duty against the Director Defendants; Count II for Constructive Trust against Inland; and Count III for Unjust Enrichment against Inland.  The Defendants have responded with a Motion to Dismiss pursuant to Rule 12(b)(6).

## A. Count I - Breach of Fiduciary Duty

The parties spend considerable time and effort on defining the extent of the fiduciary duty owned by the Directors to shareholders under Maryland law.  Plaintiffs contend that it includes a duty of candor while Defendants contend that the only duties owed shareholders are those set forth in Section 2-405.1 of the Maryland Corporate and Associations Law, which does not include "candor" or "disclosure."

The parties then proceed to dissect the Maryland Supreme Court case of *Shenker v. Laureate Education, Inc.,* 983 A.2d 408 (Md. 2009).  *Shenker* involved a "cash-out merger," which was the forced sale of shares of dissenting shareholders to an outside buyer.  The court held that in that context the board of directors owed the common law duty of candor and the duty to maximize the value to the shareholders.  The court distinguished the fiduciary duty of care owed by directors when they undertake managerial decisions on behalf of the corporation and the fiduciary duty they assume after a decision is made to sell the corporation.  The court cited with approval *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del. 1986), where the Delaware Supreme Court noted that when the decision to sell the corporation is made, the role of the Directors changes "from defenders of the corporation bastion to auctioneers [charged] with getting the best price for the stockholders at a sale of the company."  The Maryland court then

held that in the context of the cash-out merger, a duty of candor existed in addition to those duties enumerated in Section 2-405.1. It tellingly refrained from holding that in any and every decision involving directors and shareholders a duty of candor existed. In fact, it appears that a fair reading of *Shenker* is that where Directors are acting in a managerial capacity, the duties owed are those contained in Section 2-405.1 and do not include the common law duty of candor.

Therefore, based on the Court's "fair reading" of *Shenker,* the question is: in what capacity were the Directors acting when they established the price charged for shares in the DRP. It seems clear that in that context they are acting in a managerial capacity. Section 2-401. Function of directors states that:

    (A)  Management. – The business and affairs of a corporation shall be managed under the direction of a board of directors.

    (B)  Power of Board. – All powers of the corporation may be exercised by or under the authority of the board of directors except as conferred on or reserved to the stockholder by law or by the charter or bylaws of the corporation.

Here it is clear that in managing Inland the Board had the power to set the price to be charged in both the sale of stock to the public and the sale of stock to shareholders through the DRP. It must be remembered that Board members owe a fiduciary duty to the corporation as well as a duty to the shareholders. Certainly the sale of stock to the public or to shareholders through the DRP is

intended to raise cash for the corporation so that it may carry out its strategic plan which depended on a strong cash position in order to be in a position to purchase commercial real estate when the opportunity arose. Certainly if the Board set the price too high, this would inhibit the sale of stock to both the public and to the existing shareholders. If it set the price too low, the corporation would be denied the benefit that a higher price would bring. No one forced the Plaintiffs to purchase stock through the DRP. The Prospectus made it perfectly clear that the price set by the Board was at best an estimate; that the real value could be higher or lower than the established price. It would appear, therefore, that in setting the share sale price the Board Defendants owed Plaintiffs only the obligations set forth in Section 2-405.1.

Section 2-405.1, entitled "Standard of care required of directors," states in pertinent part:

> (A) In general. – A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
>
> (1) In good faith;
>
> (2) In a manner he reasonably believes to be in the best interests of the corporation; and
>
> (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

Both sides cite the Delaware case of *Malone v. Brincat,* 722 A.2d 5, 10 (Del 1998), which stands for the proposition that issue is not whether the board breached its duty of disclosure but whether it breached its more general duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company. There is no contention that the Board knowingly disseminated false information about Inland's finances, or that the financials published in the Form 10Q reports were inaccurate.

Therefore, the issue is whether the alleged inflation of the share price on the four specific occasions charged by Plaintiffs would support a finding a breach of the duty of loyalty and good faith. The answer is clearly "no." Here the Board established an estimate of share price so that it could raise capital in order to carry out its strategic plan. It specifically told the Plaintiffs (and other putative class members) that the price was an estimate and could be either higher or lower than the one it set. How this could be interpreted as "knowingly disseminating to the shareholders false information" is beyond cavil. The Board has repeatedly made all of the disclosures required of it by the Securities Exchange Act of 1934, including quarterly reports on Form 10Q which contains complete and detailed financial information. Plaintiffs do not contend in their Complaint that any part of their financial information was false. The mass of detail

available to Plaintiffs from these financial reports certainly made it possible for Plaintiffs to make their own determination as to a reasonable share value for the company, or at least make a determination that the data did or did not support the Defendants' share price designation. Plaintiffs also do not contend in their Complaint that the Board did not follow the 3 factor test described *supra* at page 3 in establishing a share price.

Plaintiffs make reference to a SEC investigation of Inland, relating to business management fees, relationships with affiliates, and determination of property evaluations. Plaintiffs do not appear to rely on this investigation, and the subsequent internal investigation authorized by the Board, in making its case for breach of fiduciary duty. They could not in any event because the subject matters of the investigation relate to possible injury or damage to Inland which would only be raised by way of a derivative action. *See, Shenker,* 983 A 2d. at 423.

To survive a Rule 12(b)(6) Motion to Dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (1997). The plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). Here Plaintiffs have failed to allege any facts that would entitle it to relief. The mere act of a Board, exercising its

managerial power to establish a price for its stock, even if
obviously wrong, would not amount to a breach of a fiduciary duty
owed to its shareholders.  The Plaintiffs' theory of liability is
not only implausible but non-existent.  Count I is dismissed.

### Counts II and III -- Claims for Constructive
### Trust and Unjust Enrichment

In Count II Plaintiffs seek to impose a constructive trust
against Inland on the funds and Count III seeks a claim for unjust
enrichment.  Both of these claims are in equity and rest upon
Plaintiffs' claim for breach of fiduciary duty, which the Court has
determined did not occur.  A constructive trust is employed by a
court of equity to convert the holder of the legal title to
property into a trust for one whom in good conscience should reap
the benefits of possession of the property.  "This remedy applies
when a defendant has acquired property by fraud, misrepresentation,
or other improper method or where the circumstances render it
inequitable for the party holding the title to retain it." *Wimmer
v. Wimmer,* 414 A.2d 1254 (Md. 1980).  Unjust enrichment is based on
the law of restitution.  A person who has been unjustly enriched at
the expense of another can be required to make restitution to the
other.  It is an equitable remedy and is ordinarily unavailable
where there is a legal remedy such as breach of contract.  "This
rule holds the contract parties to their agreement and prevents a
party who made a bad business decision from asking the court to
restore his expectations." *County Commissioners of Caroline County*

- 14 -

*v. J Roland Dashiell & Sons, Inc.,* 747 A.2d 600, 610 (Md. 2000), citing *Prodromos v. Poulos,* 148 Ill. Dec. 345 (1990). Here Plaintiffs executed a Subscription Agreement which governed their stock purchase. They believe they made a poor decision. They cannot seek a remedy in equity. Accordingly, Counts II and III are dismissed.

### III. <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motion to Dismiss Counts I, II and III of Plaintiffs' Complaint is granted with prejudice.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date:11/18/2013

- 15 -